Scileppi, J.
The defendant, William Epton, has been found guilty on three counts of a four-count indictment. After a trial with a jury in the Supreme Court, New York County, he was convicted of conspiracy to riot (Penal Law, §§ 580, 2090), conspiracy to commit the crime of advocacy of criminal anarchy *501 (Penal Law, §§ 160,161, 580), and advocacy of criminal anarchy (Penal Law, §§ 160, 161). A fourth count, charging defendant with the substantive crime of riot, was dismissed by the trial court for lack of evidence as to any direct, causal connection between Epton’s activities and the Harlem riots of the Summer of 1964. Defendant was sentenced to one-year concurrent sentences on the three counts on which he was found guilty.
The defendant, a self-acknowledged Marxist and president of the Harlem “ club ” of the Progressive Labor Movement, a splinter communist club dedicated to violent revolution, was shown by the evidence on his trial to have been active in the Harlem community for many months prior to the 1964 riots. His activities before the riots, however, appear largely to have been limited to formation of a small cadre of followers, who, presumably, would play leadership roles in the eventual revolution toward which their movement was directed. There is no evidence in the record that Epton or his party at any time had a substantial following in the community, and one gets the distinct impression on reading the record that, had it not been for the apparently spontaneous build-up of pressures within the Negro ghettoes of New York City in the Summer of 1964, following the killing of a 15-year-old Negro boy by an off-duty police lieutenant, Epton and his group might well have continued little noticed and of scant significance to anyone but themselves. There is, likewise, no evidence here that the defendant or his alleged co-conspirators had any hand in causing the riots that began on the evening of July 18, 1964, and it would appear that it was not until May, 1964, when tensions in Harlem had already heightened over the issue of police brutality, that Epton and the others seized upon the notion that this unrest in the community might be utilized by them in developing a mass following.
On the afternoon of the 18th, just before the riots began, Epton took to the streets of Harlem preaching his gospel of revolution and calling for organized resistance to the police. Addressing an audience numbering about 50 persons, the defendant spoke of the need for violent action:
“ [W]e’ll begin a campaign to organize a mass demonstration against the cops somewhere in this city. As it stands now, many organizations are talking and planning of where this demonstration is going to take place and we’re not saying it’s going to be *502 a peaceful demonstration * * *. They [the cops] declared war on us and we should declare war on them and every time they kill one of us damn it, we ’ll kill one of them and we should start .thinking that way right now # * * because we had better stop talking about violence as a dirty word * *
“ If we ’re going to be free, and we will not be fully free until we smash this state completely and totally. Destroy and set up a new state of our own choosing and of our own liking. And in that process of making this state, we’re going to have to kill a lot of these cops, a lot of these judges, and we’ll have to go up against their army. We’ll organize our own militia and our own army * * *. Think about it because no people in this world have ever achieved independence and freedom through the ballot or having it legislated to them. All people in this world who are free got their freedom through struggle and through revolution. That’s the way to gain'freedom.
“ We will take our freedom. We will take it by any means necessary and any means necessary as we know the beast that we are dealing with is that we. have to create a revolution in this country and we will create a new government that is run by the people * * *. Those who are ready to come with us and stand with us and join the Harlem Defense Council * * * will go back into their blocks and organize their blocks into defense committees so when the deal goes through they will be able to be in the street tens of thousands strong ready to face that man. And we know how to use weapons just like they know how to use weapons. And when the deal goes down we have to be ready to confront them and beat them ”.
In the days that followed, the Harlem headquarters of the Progressive Labor Movement became a beehive of activity with the defendant exhorting those in attendance to organize their blocks to combat the police and with the defendant and his helpers feverishly getting out leaflets attacking the police. Much of this effort was directed toward generating enthusiasm for a mass demonstration planned for July 25th. If the People’s evidence is to be believed, and the. jury was entitled to believe it, the only conclusion that can reasonably be drawn is that, in the week following the commencement of the riots on the 18th, Epton and the others named as his co-conspirators were engaged in doing their utmost toward keeping the disturbance going and *503 their purpose in planning the demonstration for the 25th was to trigger further violence and rioting.
Specific examples of the sort of evidence which justifies, if not compels, the conclusion that defendant and his alleged co-conspirators had agreed to try to incite the people of Harlem to further and continued rioting are the following:
(1) Testimony by Detective Hart, the undercover police officer planted in defendant’s group, to the effect that on July 19th, within sight and hearing of the ongoing riots, the defendant addressed a group of about 35 to 40 persons at the Harlem headquarters of the Progressive Labor Movement, stating that the people of the area would have to organize to combat the police and that there were various means of defeating the police, including “suckering” the officers off the main avenues into the side streets away from other policemen where they could be killed one by one.
(2) Testimony by another police officer, Patrolman Johnson, who was present in plain clothes at the Progressive Labor Movement headquarters on the night of the 19th that he heard the defendant on that occasion, in answer to a question by a woman in the audience inquiring how they could fight the “cops”, suggest that their “ block captains ” could teach them how to make weapons out of things in the street, informing his audience that when bottles are filled with a “ certain substance ” (presumably gasoline) they become “very effective” (as Molotov cocktails).
(3) Testimony by Hart that on the 20th the defendant told him that it was his wish to “ start something ” over in Brooklyn in order to spread thin the police forces concentrated in Harlem, and he was sending speakers to a rally there planned for the following day.
(4) Wired with a “minifon”, Hart on the 21st recorded a conversation involving the defendant, Hart, and certain others, wherein, with respect to his planned demonstration set for the 25th, Epton said ‘ ‘ Oh, its going to lead to nothing but a slaughter, a massacre e * * a massacre.”
(5) On the 23d the defendant allegedly told Hart of his arrangements for the march set for the 25th and how he hoped the crowd would react violently to his expected arrest.
*504 Coupled with this evidence is the defendant’s admitted responsibility for the production of thousands of inflammatory posters and pamphlets (although the trial court did hold that the one. pamphlet for which defendant denied responsibility, containing instructions on the manufacture of Molotov cocktails, had not been shown to be connected with the defendant’s group and, thus, should be stricken as evidence). These publications seem clearly to have been designed to further arouse the already troubled people of Harlem. All in all, the people’s evidence, most of which is not seriously disputed by the defendant, paints a picture of an organized campaign aimed at fostering continuance of the riots.
On this appeal, the defendant alleges many grounds upon which his convictions should be reversed, the principal ones being: (1) that his convictions on the counts in the indictment charging him with violation of sections 160 and 161 of the Penal Law and with conspiracy to violate the aforesaid sections cannot stand on the ground that sections 160 and 161 as construed by this court in People v. Gitlow (234 N. Y. 132) are an unconstitutional restraint on free speech; (2) that the Smith Act of 1940 (U. S. Code, tit. 18, § 2385) supersedes the enforcibility of our criminal anarchy statute; (3) that his conviction for conspiracy to riot cannot stand because so much of the evidence against him on this count consisted of speech, therefore, a conviction on that count would amount to punishment directed solely at speech, and (4) that he was illegally convicted of the crime of conspiracy to riot since conspiracy to riot was merged into the substantive charge of riot which was dismissed by the court. Finding defendant’s contentions to be without merit, we affirm.
When we last considered the constitutionality of sections 160 and 161 of the Penal Law, we held, and the Supreme Court of the United States affirmed over the vigorous objection of Mr. Justices Holmes and Brandéis, that they were constitutional (People v. Gitlow, supra, affd. sub nom. Gitlow v. New York, 268 U. S. 652). We are, of course, aware that the Supreme Court’s view of the First Amendment’s protection of speech has been altered drastically since Gitlow was decided. Although Gitlow has never been expressly overruled, it is now generally conceded that the Holmes-Brandeis view in Gitlow which insisted upon a showing *505 of “ clear and present danger ” before one’s freedom of speech may be abridged represents today’s law (Dennis v. United States, 341 U. S. 494; Yates v. United States, 354 U. S. 298).
We are thus presented with a statute which is unconstitutional as interpreted. The dissent contends that our decision in Gitlow reflects the Legislature’s intent to make unlawful the mere advocacy of violent revolution, and that we are bound by our prior decision under the doctrine of stare decisis. We cannot agree.
It must be assumed that the Legislature intended to enact a statute which was in harmony with the United States Constitution and the Constitution of the State of New York (People v. Finkelstein, 9 N Y 2d 342). When we first interpreted this statute in 1922, we did so in light of the prevailing conditions of that time and in accordance with the current understanding of First Amendment freedoms. As we have noted, re-examination of our First Amendment rights both by our court and the Supreme Court of the United States has resulted in a clearer understanding of the scope of constitutional protection of speech. We have not had an opportunity, however, until now, to re-examine our determination in Gitlow in light of the recent developments in constitutional theory. Now that our criminal anarchy statute is again before us, we have the obligation of construing it in accordance with sound constitutional principles so as to preserve its constitutionality. (People v. Finkelstein, supra, p. 345; Dollar Co. v. Canadian Car & Foundry Co., 220 N. Y. 270.) In Dollar, this court was presented with a statute which we had previously found to be constitutional. Subsequent holdings by the Supreme Court, however, made it clear that our previous interpretation of the statute in question was no longer in harmony with the Federal Constitution. The argument was made in Dollar that the court was bound under the doctrine of stare decisis to its previous interpretation and it could not reconstrue the statute in order to sustain it. The court speaking through Chief Judge His cook stated: “ The language of [the statute] remains precisely as it was then and the rule governing our interpretation of it remains unchanged, and it seems to us that we are now bound to give to its language an interpretation which is in accordance with and not in defiance of the Constitution, even though such interpretation is different than the one which *506 was given under a former and, as it must now be assumed, mistaken idea of the law. The obligation to construe the statute in accordance with the Constitution remain constant, and if the definition of the requirements of the Constitution in respect of this question has been changed, it seems inevitably to follow that we must place upon the statute a construction which will be so modified as to be in accordance with the latter view” (Dollar Co. v. Canadian Car & Foundry Co., supra, pp. 277-278).
What are these sound constitutional requirements which must now be read into our criminal anarchy statute to preserve its constitutionalityÍ It is clear that the proscription of mere advocacy of the violent overthrow of the Government would be an unconstitutional infringement upon free speech (Dennis v. United States, supra). The advocacy of the overthrow of the Government by force and violence must be accompanied by an intent to accomplish the overthrow (Dennis v. United States, supra; Keyishian v. Board of Regents, 385 U. S. 589) and there must bea “ clear and present danger ’ ’ that the advocated overthrow may be attempted or accomplished (Dennis v. United States, supra).
There is no doubt that Epton intended to inflame the already intense passions of the troubled people of Harlem and to incite them to greater violence. Furthermore, defendant’s exhortations calling for organized resistance to the police and the destruction of the State, in the setting of Harlem during the week of July 18th, formed a sufficient basis for the trial court and jury to conclude that his words and actions created a “ clear and present danger ” that the riots then rocking Harlem would be intensified or, if they subsided, rekindled.
The dissent contends that our reinterpretation of the criminal anarchy statute in accordance with modern day constitutional standards violates the defendant’s right to procedural due process since he was not given fair notice of what acts would be punished. Aside from the fact that the defendant can be charged ‘ ‘ with knowledge of the scope of subsequent interpretation ” by this court (Winters v. New York, 333 U. S. 507, 514; People v. Finkelstein, 9 N Y 2d 342, 345-346), he had the benefit of the Supreme Court’s interpretation in Dennis of the Smith Act (U. S. Code, tit. 18, § 2385), the language of which is practically identical to the language of our criminal anarchy statute.
*507 While the defendant may find support in Pennsylvania v. Nelson (350 U. S. 497) for his contention that Federal legislation has pre-empted the field of control of subversive activities, subsequent pronouncements by the Supreme Court have restricted the scope of the Nelson opinion and have left the defendant’s contention without merit. In Uphaus v. Wyman (360 U. S. 72) and DeGregory v. New Hampshire Atty. Gen. (383 U. S. 825), the court made it clear that a State could validly prosecute seditious activity directed against a State or local government even though Congress has pre-empted the field of sedition which is directed against the Federal Government (see, also, Matter of Prensky v. Geller, 22 A D 2d 559, mot. for lv. to app. den. 16 N Y 2d 486, app. dsmd. 384 U. S. 101; Matter of Goldstein v. Gellinoff, 19 N Y 2d 792).
Defendant’s contention that his conviction for conspiracy to riot cannot stand because so much of the evidence against him consisted of speech, misrepresents the gravamen of the conspiracy to riot charge. The gravamen of the charge is that the defendant entered into an unlawful agreement with others to incite and instigate riot and committed certain overt acts in furtherance of this end. Though speech may have been a means by which the defendant sought to further this end of the conspiracy, speech in and of itself is not the object of a prosecution for conspiracy to incite riot. There are, of course, First Amendment limitations upon prosecutions for nonspeech crimes, where the evidence of such crimes consists solely of speech. As Chief Justice Vinson observed in Dermis, “ Where an offense is specified by a statute in nonspeech or nonpress terms, a conviction relying upon speech or press as evidence of violation may be sustained only when the speech or publication created a ‘ clear and present danger ’ of attempting or accomplishing the prohibited crime ” (Dennis v. United States, supra, p. 505). As was stated above, the evidence adduced by the People was more than sufficient to sustain a finding of a “ clear and present danger ” of riot.
Defendant’s argument that the crime of conspiracy to incite riot necessarily merges in the crime of riot is equally ill-founded. It is well settled that conspiracy is an independent crime for which a defendant can be indicted in addition to being indicted for the substantive crime he allegedly conspired to commit *508 (People v. Tavormina, 257 N. Y. 84). A conspiracy to riot is quite separable from the riot itself. The essence of a conspiracy is an agreement or plan among two or more persons to commit a crime in the future. The crime of riot, however, is not committed until three or more persons, actually assembled, have disturbed or immediately threatened the public peace. A previous agreement or plan is not a necessary element of the crime (Penal Law, §§ 2090, 2091). One who agrees with others to organize a riot sometime in the future and who commits an overt act pursuant to that agreement is guilty not of riot but of conspiracy to riot. Therefore, the conspiracy to riot charge and the conviction thereof was proper.
We have examined the other contentions raised by the defendant and have found them to be equally lacking in merit. Accordingly, the judgment of the Appellate Division affirming the defendant’s conviction for the crimes of conspiracy to riot, conspiracy to commit the crime of advocacy of criminal anarchy and advocacy of criminal anarchy should be affirmed.