**UNITED STATES of America ex rel. William EPTON, Petitioner,**

v.

**Albert NENNA, Warden, Manhattan House of Detention for Men, Respondent.**

**No. 68 Civ. 461.**

United States District Court, S. D. New York.

Oct. 5, 1970.

Eleanor Jackson Piel, New York City, for petitioner.

Frank S. Hogan, Dist. Atty., New York City, for respondent; Michael R. Juviler, David Otis Fuller, Jr., New York City, of counsel.

### FRANKEL, District Judge.

This habeas corpus proceeding comes on for decision after a long, unusual and, possibly, edifying procedural history.

The petitioner was indicted by a New York grand jury on June 7, 1965, upon charges of riot (former N.Y. Penal Law, McKinney's Consol. Laws c. 40, § 2090), conspiracy to commit riot (former N.Y. Penal Law §§ 2090, 580), criminal anarchy (former N.Y. Penal Law §§ 160, 161), and conspiracy to commit criminal anarchy (former N.Y. Penal Law §§ 160, 161, 580). The first of these charges was dismissed for lack of evi-

dence by the trial judge. Petitioner was found guilty by the jury on the rest, and sentenced to one year on each count, the sentences to be served concurrently.

Appeals through the New York courts resulted in affirmances. People v. Epton, 19 N.Y.2d 496, 281 N.Y.S.2d 9, 227 N.E.2d 829 (1967), aff'g 27 A.D.2d 645, 276 N.Y.S.2d 847 (1966). Epton petitioned for a writ of certiorari and appealed, urging, *inter alia*, the unconstitutionality of New York's criminal anarchy statute.[1] On January 22, 1968, certiorari was denied and the appeal was dismissed for want of a substantial federal question. 390 U.S. 29, 88 S.Ct. 824, 19 L.Ed.2d 808, rehearing denied, 390 U.S. 976, 88 S.Ct. 1057, 19 L.Ed.2d 1198 (1968), petition for leave to file a petition for rehearing out of time denied, 398 U.S. 944, 90 S.Ct. 1832, 26 L.Ed.2d 282 (June 1, 1970). Two Justices wrote brief opinions on this disposition, one dissenting, one explaining the grounds for his concurrence, and these are factors of some interest now, as will be discussed below.

On February 5, 1968, after serving some three months of his one-year sentence, petitioner brought the present application for habeas. He presented again the several constitutional claims that had been before the Supreme Court. In addition, he attacked the composition of the grand jury that had indicted him, pointing out that the facts underlying this contention had never been heard in the state courts. It was evident that at least the last of these arguments presented a problem of substance, probably requiring some considerable time for its resolution. See Chestnut v. People of State of New York, 370 F.2d 1, 6–8 (2d Cir.1966), cert. denied 386 U.S. 1009, 87 S.Ct. 1355, 18 L.Ed.2d 439 (1967). It seemed evident, moreover, that full consideration of this subject could probably not be accomplished before most or all of petitioner's sentence

---

1. In his petition for certiorari, at 16n., Epton explained that he was proceeding by way of certiorari as well as appeal because of the wording of Mr. Justice Har-

lan's order continuing bail "pending the timely filing and disposition of a petition for certiorari."

had been served. Furthermore, it was agreed that the proper place for at least the initial consideration of this matter was the state rather than the federal court. See *id.* at 6.

Reasoning together upon these considerations, counsel and the court agreed that the matter should properly go before a state tribunal for decision upon the merits; that suitable procedures were available for such handling; and that the State ought, with the consent of the prosecutor, to release petitioner on bail pending the determination of his claims. This court concluded that it would hold the petition pending such steps in the state court. Then, with what proved to be premature enthusiasm, this court recorded the history of what was then thought to be an instance of effective and agreeable comity. United States ex rel. Epton v. Nenna, 281 F. Supp. 388 (S.D.N.Y.1968).

On Friday, February 16, 1968, the petitioner appeared with counsel in the Supreme Court of New York County to institute a coram nobis proceeding and have himself released on bail. This court is informed that the State Judge on that morning announced his willingness to permit the release on bail, instructing counsel for petitioner to proceed with the procurement of a bondsman and the accomplishment of other necessary details. On the afternoon of the same day, for reasons which have never been spread upon any record known to this court, the state tribunal revoked its determination of the morning and announced that bail would not be allowed. In these circumstances, this court ordered petitioner's release the following morning on bail of $25,000 pending completion of his state coram nobis proceedings. He has been free on this order ever since.

The parties then went forward with petitioner's state post-conviction proceeding. It was agreed that Epton's claim concerning the composition of the grand jury would be determined substantially on the basis of a record already made in People v. Chestnut et al., where a pre-trial motion challenging New York's method of selecting grand jurors had been denied after a hearing.[2] N.Y.L.J., April 5, 1967, p. 18, c. 6. On June 4, 1970, the Court of Appeals for the State of New York affirmed, as modified, the *Chestnut* convictions, including the grand jury ruling, 26 N.Y.2d 481, 311 N.Y.S.2d 853, 260 N.E.2d 501 (1970). Accordingly, the Supreme Court of New York County denied Epton's coram nobis petition on June 18, 1970.

Returning here, where the habeas petition had been held in abeyance, the parties filed extensive briefs and were heard orally. The application for federal relief is finally ready for decision. It must be denied.

I.

■ Petitioner's main point here, as has been noted, is his attack upon the composition of the grand jury that indicted him. His arguments are not without substance. See Chestnut v. People of State of New York, 370 F.2d 1, 7 (2nd Cir.1966).[3] They have been rejected, however, by a large and unanimous array of New York State Judges. While that, in the nature of the habeas jurisdiction, does not bind a single federal judge at *nisi prius*, it is of interest. At any rate, this court reaches the conclusion that the state judgment must be sustained.

■ On its face at least, the most serious claim in this regard is that the

2. Prior to the state hearing and trial, the *Chestnut* defendants brought a removal action in this court under 28 U.S.C. § 1443 (1), challenging the grand jury selection system on constitutional grounds. The Court of Appeals affirmed an order of remand. Chestnut v. People of State of New York, 370 F.2d 1 (2 Cir. 1966), cert. denied, 386 U.S. 1009, 87 S.Ct. 1355, 18 L.Ed.2d 439 (1967).

3. As indicated above, Epton's grand jury challenge has proceeded on the basis of a hearing record prepared in People v. Chestnut et al.

court should infer a pattern of unconstitutional discrimination from the low representation of black people and Puerto Ricans on the New York County grand jury. It is not necessary to labor the point that in our constitutional scheme invidious racial classifications are fundamentally and uniformly intolerable. Recognizing that, the court concludes nevertheless that petitioner fails in this branch of his argument. There is no showing of purposeful or intentional discrimination against any racial or ethnic group. The facts and the governing legal principles are amply reviewed in the opinion of Chief Judge Fuld for his unanimous Court of Appeals. See also United States v. Bennett, 2nd Cir., 409 F.2d 888, 892, aff'g United States v. Leonetti, 291 F.Supp. 461 (S.D.N.Y.1968); United States v. Flynn, 216 F.2d 354, 378–389 (2nd Cir. 1954), cert. denied, 348 U.S. 909, 75 S. Ct. 295, 99 L.Ed. 713 (1955); United States v. Greenberg, 200 F.Supp. 382, 386–387 (S.D.N.Y.1961); United States v. Bowe, 2nd Cir., 360 F.2d 1, 7, cert. denied, 385 U.S. 961, 87 S.Ct. 401, 17 L. Ed.2d 306 (1966); cf. United States ex rel. Torres v. Mancusi, 427 F.2d 168 (2nd Cir. 1970); United States ex rel. Fein v. Deegan, 410 F.2d 13, 22 (2nd Cir. 1969). Recognizing that the statistics alone comprise evidence that might (with other evidence) help to prove purposeful discrimination on forbidden grounds, see, e.g., Turner v. Fouche, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970), this court finds no ground for rejecting the reasoned views on this subject of the State Court of Appeals.

■ Related to the argument about racial discrimination is petitioner's claim that the New York system of grand jury selection is infirm because of its voluntary nature. It is accepted for this purpose—indeed, it is hardly doubtful—that the racial disparities result at least in part from this factor. Petitioner's argument fails none the less. It is not shown that the system of volunteers was designed or has been administered as "an exclusionary device * * *." Hoyt v. Florida, 368 U.S. 57, 61, 82 S.Ct. 159, 7 L.Ed.2d 118 (1961). The State's Legislature could rationally have concluded that volunteers for the solemn responsibilities of grand jurors would be more reliable, devoted and effective than compelled members. There is no ground in reason or authority for holding that coercion is a constitutional requirement in this area any more than it is in connection with voting—though we may readily accept that some defendants, like some candidates, might fare better if higher proportions of certain groups were produced by a compulsory system than by a system of choice.[4] At least on the record here, New York's volunteer system is no more vulnerable than the selectively voluntary system upheld in Hoyt v. Florida, *supra.*

■ On another front, while the governing state statute, New York Judiciary Law, McKinney's Consol.Laws, c. 30, § 596(2), makes people aged 21 to 70 eligible for service, it is undisputed that at the time in question those administering the law excluded persons younger than 35 or over 65. Petitioner attacks the exclusions of those below 35. This court need not (and does not) applaud the wisdom of this exclusion to sustain its constitutionality.[5] It is pertinent here, as elsewhere on this subject, that the state (1) is not required to proceed by

---

4. Whatever strictures we hear these days about "permissiveness," there is no question in our courts that our prima facie preference is for freedom as a principle of government.

5. There is no question in this court, of course, as to the validity of the exclusion under state law. As to that, petitioner's claims have been rejected by the State's highest Court. The case comes here, then, as if a lower age limit of 35 were written into the statute. Murdock v. Memphis, 87 U.S. (20 Wall.) 590, 22 L.Ed. 429 (1875); Amer. Ry. Express Co. v. Kentucky, 273 U.S. 269, 47 S.Ct. 353, 71 L.Ed. 639 (1927); Scripto, Inc. v. Carson, 362 U.S. 207, 210, 80 S.Ct. 619, 4 L.Ed.2d 660 (1960).

grand jury indictment at all, Hurtado v. California, 110 U.S. 516, 4 S.Ct. 111, 292, 28 L.Ed. 232 (1884); Beck v. Washington, 369 U.S. 541, 545, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962), and (2) may assign the decision to prosecute to highly selected and specially qualified people —e.g., law-trained prosecutors. Lem Woon v. Oregon, 229 U.S. 586, 33 S.Ct. 783, 57 L.Ed. 1340 (1913); Gaines v. Washington, 277 U.S. 81, 86, 48 S.Ct. 468, 72 L.Ed. 793 (1928); Beck v. Washington, 369 U.S. 541, 545, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962). This does not mean, of course, that the State, in making up grand juries or otherwise, may employ arbitrary, irrational or otherwise lawless discriminations. It does suggest, however, that the latitude for judgment by the State is broader than petitioner would have it.

■ On the specific subject of age, the State justifies the minimum age of 35 on the grounds that grand jurors ought to have had petit jury experience, and that the powers of grand juries are broad, potentially drastic and relatively unfettered, requiring people of mature years and other qualities that give promise of stability. Reasonable people could differ about this judgment, just as they might about the prescription in the Constitution of minimum age requirements for high federal office—35 for the Presidency (Art. II, § 1), 30 for the Senate (Art. I, § 3), 25 for the House of Representatives (Art. I, § 2). Without pursuing strained comparisons between the White House and the grand jury room, we note that age qualifications have been included among an array of others deemed permissible as criteria for both grand and petit jury service. See Carter v. Jury Commission, 396 U.S. 320, 332–333, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970).

■ Coming to what is for this court the most difficult issue of all, though it appeared to be of only passing concern for the State Court of Appeals, we note the undisputed fact that welfare recipients were excluded from New York County grand juries at the time here in question. If they do not share the almost inexorable condemnation visited upon racial classifications, invidious distinctions in terms of wealth or poverty are not in markedly greater favor. Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956); Harper v. Virginia State Board of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966); Turner v. Fouche, 396 U.S. 346, 361–364, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970); Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). It would be difficult today to justify as an ongoing practice the discrimination against both welfare recipients themselves and at least many defendants entailed in the kind of exclusion here assailed. Acknowledging grave doubts, however, this court concludes that the point cannot prevail in the particular circumstances of its presentation here.

First of all, the record before us does not demonstrate, but tends to dispel, any showing of discrimination against poor people as such. The New York Judiciary Law § 598, disqualifies for jury service not only broad categories of elected and appointed officials in high office, but any state or federal "employee * * * receiving annual compensation in excess of one thousand dollars from [government] * * * sources * * *." Whether or not this is wise or essential, rational people could surely entertain the broad underlying premise that those dependent upon government for substantial income might be unsuitably conflicted if they served as jurors.[6] And the evidence here indicates that it was this rather than an animus against poor people that led to the administra-

---

6. Compare the cases in which defendants, though unsuccessfully, have urged such grounds in challenges for cause. E. g., Dennis v. United States, 339 U.S. 162, 70 S.Ct. 519, 94 L.Ed. 734 (1950);

Frazier v. United States, 335 U.S. 497, 69 S.Ct. 201, 93 L.Ed. 187 (1948); Kempe v. United States, 8 Cir., 160 F. 2d 406, cert. denied, 331 U.S. 843, 67 S.Ct. 1534, 91 L.Ed. 1864 (1947).

tive practice now in question. As Chief Judge Fuld observed, this view held by the responsible officials "may have been erroneous," but that does not in itself pose a problem of federal constitutional law (see note 5, *supra*).

The New York Court of Appeals not only cast doubt under state law upon the exclusion of people on welfare; it also made its decision on the understanding that the practice "has since been discontinued." There has been some quarrel here about the correctness of that understanding. If it were necessary to resolve this incidental difference, this court would find no sufficient basis for rejecting what Chief Judge Fuld stated as the fact. More importantly, however, we are entitled to assume that the recorded understanding of the State's highest Court, promoted there and reaffirmed here by the State's legal officers, represents the reality upon which all may confidently rely from now on. Thus, although the defect is not retroactively cured for Epton's case in any event, but having in mind, too, that he has shown no concrete prejudice to himself on this account, we find the State's position buttressed by the fact that there is no prospective good to be served by invalidating the conviction. See Bennett v. United States, 2nd Cir., 409 F.2d 888, 892–893; United States ex rel. Fein v. Deegan, 410 F.2d 13, 22 (2nd Cir.1969); United States ex rel. Torres v. Mancusi, 427 F.2d 168, 169 (2d Cir.1970); Ballard v. United States, 329 U.S. 187, 206, 67 S.Ct. 261, 91 L. Ed. 181 (1946) (Frankfurter, J., concurring).

Finally, a similar but less important point is made of the fact that the law of New York at the time in question contained a dubious requirement, see Samuels v. Mackell, 288 F.Supp. 348, 356 (S.D.N.Y.) (Friendly, J., for 3-judge court), prob. juris. noted, 393 U.S. 975, 89 S.Ct. 453, 21 L.Ed.2d 437 (1968), that a person have property worth $250 in order to be eligible for jury service. The record here shows that this provision was not enforced in 1964, when Ep-

ton was indicted, and it has since been deleted from New York Judiciary Law § 596. There is some evidence that it was enforced as late as 1960, and it is argued that the normal replacement rate was such that grand juries four years later would still have reflected the questionable criterion. But the point dwindles with this to a speculative and attenuated proposition that cannot be deemed a substantial reason for nullifying petitioner's indictment and subsequent conviction by a petit jury the composition of which is not assailed. See United States v. Leonetti, 291 F.Supp. 461, 476 (S.D.N.Y.1968); United States v. Dennis, 183 F.2d 201, 217–218 (2nd Cir. 1950); United States v. Van Allen, 208 F.Supp. 331, 336 (S.D.N.Y.1962).

We conclude, in sum, that petitioner's arguments about the character of the grand jury are—singly in some instances, and certainly in cumulation—scarcely insubstantial. On balance, however, and if not with certainty, this court finds them insufficient to invalidate his state conviction.

## II.

In addition to his attack on the grand jury, petitioner urges a number of other grounds for voiding his conviction. For the most part these arguments are the same as those he took to the Supreme Court in his appeal and petition for writ of certiorari. The Supreme Court, as noted above, dismissed the appeal without opinion "for want of a substantial federal question" and denied certiorari. 390 U.S. 29, 88 S.Ct. 824, 19 L.Ed.2d 808 (1968). There were, however, short opinions by two Justices. Concurring in the Court's disposition, Mr. Justice Stewart stated that he thought the conspiracy to riot conviction should stand, and that under the concurrent sentence doctrine there was no reason to consider the other convictions for which concurrent sentences had been ordered. *Id.* Mr. Justice Douglas, finding all three convictions vulnerable, dissented. *Id.* at 30, 88 S.Ct. 824. Two petitions for rehearing, including one filed this year

(more precisely, a motion for leave to file a petition for rehearing out of time), were denied. 390 U.S. 976, 88 S. Ct. 1057, 19 L.Ed.2d 1198 (1968); 398 U.S. 944, 90 S.Ct. 1832, 26 L.Ed.2d 282 (June 1, 1970).

■ Petitioner invites us to reconsider all the issues that were before the Supreme Court in 1968. The proposal is too broad. Whatever the Supreme Court has already decided in the case is the law of the case, and binds us. See, e.g., Ex parte Sibbald v. United States, 37 U.S. (12 Pet.) 488, 492, 9 L.Ed. 1167 (1838); Banco Nacional de Cuba v. Farr, 383 F.2d 166, 177–178 (2nd Cir. 1967); Munro v. Post, 102 F.2d 686, 688 (2nd Cir.1939); 1B Moore, Federal Practice ¶ 0.404[10]. The law of the case applies to what was decided "either expressly or by necessary implication." 1B Moore, *supra*; Munro v. Post, *supra*, 102 F.2d at 688.

■ Applying these principles, this court finds foreclosed here the serious questions petitioner renews about the constitutionality of New York's former criminal anarchy law, N.Y. Penal Law §§ 160, 161,[7] but deems it necessary to consider other, lesser arguments that were not resolved in the highest Court "by necessary implication." As to the area foreclosed, our analysis runs like this: the attack petitioner brought to the Supreme Court upon the state anarchy statute was the proper and sufficient basis for his being before that Court by appeal rather than certiorari, 28 U.S.C. § 1257(2). The majority, without opinion, dismissed the appeal "for want of a substantial federal question." That was, for purposes of the appealable question, a disposition "on the merits" sufficient to conclude the subject for this court.[8] The phrase "on the merits" is in quotation marks here to flag its ambiguity, but either of its possible meanings in context leads to the same result for us at the present juncture:

(1) The Supreme Court, though we are entitled to find this improbable, may have considered the substantive issues attending the anarchy statute and decided them summarily against petitioner. That would be the most obvious bar to reconsideration here.

(2) Some or all of the other Justices in the majority may have gone on the concurrent sentence doctrine announced by Mr. Justice Stewart as the basis for his vote. The result for us of this remaining logi-

---

7. The problem is again before the Supreme Court, in Samuels v. Mackell, *supra*.

8. There is lively disagreement among respected constitutional scholars concerning the significance of the Supreme Court's dismissal of an appeal. Some argue that since Congress has obliged the Court to hear certain appeals, 28 U.S.C. § 1257, the dismissal of such appeals must be viewed as decisions on the merits. See Wechsler, Toward Neutral Principles of Constitutional Law, in Wechsler, Principles, Politics and Fundamental Law 3, 13–15, 47 (1961); Gunther, The Subtle Vices of the "Passive Virtues," 64 Col.L. Rev. 1, 10–13 (1964); Hart & Wechsler, The Federal Courts and the Federal System 574–76 (1953); Hart, Foreword: The Time Chart of the Justices, 73 Harv. L.R. 84, 89 n. 13 (1959). Others, portraying and justifying a more politically "flexible" Court, have tried to demonstrate that appeals are often "dismissals for want of a convenient, or timely, or suitably presented question" for resolution by the country's highest Court. Bickel, The Least Dangerous Branch 126–127. See also, *id.* at 71, 132, 278 n. 25 & 26; Deutsch, Neutrality, Legitimacy, and the Supreme Court, 20 Stan.L.R. 169, 198–206, 213–249 (1968); M. Shapiro, Law and Politics in the Supreme Court (1964). The latter view, if accepted, might suggest that a district court could hear on habeas issues the Supreme Court has dismissed on direct appeal, just as it hears those raised in certiorari petitions which are denied.

For the time being, at least, the debate must be among scholars. Until the Supreme Court explicitly tells us otherwise, the lower courts must assume that the obligatory jurisdiction, a matter given to Congress to control, is being exercised in accordance with what appears to be the literal statutory mandate.

cal possibility is less obvious, but in the end not different.

■ Elaborating the latter proposition, this court would deem itself clearly bound by a decision of the Supreme Court that other, adequate grounds immunize the state conviction against reversal without reaching the constitutional claims concerning the anarchy law. Accordingly, as things stood on January 22, 1968, when the appeal was dismissed, this court was barred from considering those claims because the Supreme Court had either decided them or held they should not be reached. See Samuels v. Mackell, *supra*, 288 F.Supp. at 354 n.6.

Petitioner argues that after its dismissal of the appeal, the Supreme Court overruled the concurrent sentence doctrine in Benton v. Maryland, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969). Assuming this to be so, it makes no difference. This court is bound by the principles stated in Gaines v. Rugg, 148 U.S. 228, 244, 13 S.Ct. 611, 617, 37 L.Ed. 432 (1893):

"As to the suggestion that the views adopted by this court in [a case] * * * decided * * * after the present cases were decided, would, if applied to the present cases, have caused a different result in them, we are of the opinion that, without conceding that such would have been the result, this court cannot, on well-established rules and principles, permit the Circuit Court, of its own motion, to go back of, or subvert, what was settled by the opinion and mandate in the present cases."

See also Ex parte Sibbald v. United States, *supra*; Banco Nacional de Cuba v. Farr, *supra*, 383 F.2d at 177–178.

Furthermore, it is far from clear that the rule relating to concurrent sentences was ended utterly by *Benton*. What the case seems ultimately to hold is that where adverse collateral consequences may follow from a questioned sentence, the fact that it runs concurrently with a valid sentence is "no jurisdictional bar" (395 U.S. at 791, 89 S.Ct. 2056) to con-

sidering the disputed one. The case does not eliminate the doctrine "as a rule of convenience" (*id.* at 791, 89 S.Ct. 2056, at 2060):

"It may be that in certain circumstances a federal appellate court, as a matter of discretion, might decide * * * that it is 'unnecessary' to consider all the allegations made by a particular party. The concurrent sentence rule may have some continuing validity as a rule of judicial convenience. That is not. a subject we must canvass today, however."

Subsequent decisions reveal, authoritatively for this court, the continued vitality of the "discretion" thus preserved. United States v. Febre, 425 F.2d 107 (2nd Cir. 1970); United States ex rel. Weems v. Follette, 414 F.2d 417 (2nd Cir.1969); Kauffmann v. United States, 414 F.2d 1022 (8th Cir.1969); United States v. Barsaloux, 419 F.2d 1299 (5th Cir.1969), cert. denied 397 U.S. 972, 90 S.Ct. 1087, 25 L.Ed.2d 265 (1970).

If it is discretionary whether the concurrent sentence doctrine will apply despite the disposition by the Supreme Court almost three years ago, the appeal must lie to the discretion of that Court, not this one.

■ The case stands differently for the questions Epton raised in the Supreme Court which were not appealable as of right but permissible points for certiorari. It is familiar that the denial of certiorari is not to be viewed as an "expression of opinion on the merits" and that questions rejected by denials of certiorari on the direct appeal route are open later in habeas. Brown v. Allen, 344 U.S. 443, 497, 73 S.Ct. 397, 97 L.Ed. 469 (1953) (Frankfurter, J.); see also 1B Moore, *supra* at ¶ 0.404[5]; 1A Moore, *supra* at ¶ 0.230[2]. The details of this proposition could be further proliferated, but they are not momentous. This court is satisfied that on at least the first of the two subjects hereinafter discussed, petitioner is entitled to a ruling in this proceeding. Still oth-

ers will not be discussed here though they have been considered.

■ A. For his first point after the ones concerning the anarchy statute, petitioner argues that his right to due process was violated when at the close of the evidence the trial judge amended the conspiracy-to-riot count so that instead of charging a conspiracy to promote

> "an assembly of more than three persons *which disturbed* the public peace,"

it charged a conspiracy to promote

> "an assembly of more than three persons which *would disturb* the public peace * * *." (Emphasis added in both versions.)

Petitioner shows no prejudice from this revision. Cf. Russell v. United States, 369 U.S. 749, 763, 82 S.Ct. 1038, 8 L. Ed.2d 240 (1961). His claim that it violated the Fourteenth Amendment is not meritorious.

Obviously if the change altered in some meaningful way the one against which petitioner had been summoned to defend, his point would be significant. But it is equally obvious that no such unfairness occurred. The accusation in the count in question was one of *conspiracy* to riot; the substantive offense of rioting was separately charged in a separate count. Thus, petitioner had ample notice that he was accused of the substantive crime and, in addition, of the conspiracy to commit it, which would, of course, be complete whether or not the substantive goal was ever attained. Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946); United States v. Rabinowich, 238 U.S. 78, 35 S.Ct. 682, 59 L.Ed. 1211 (1915); People v. Tavormina, 257 N.Y. 84, 177 N.E. 317 (1931). All the judge's verbal change did was to make somewhat clearer this elementary distinction.

■ B. Petitioner's next argument —and the only other one requiring mod-

erately detailed treatment here—is somewhat more troublesome. He urges that his conviction for conspiracy to riot must be voided because activities protected by the First Amendment were the only overt acts charged and proved under this count.

To begin with, petitioner misstates the facts. As was noted when the case was in the Supreme Court, the evidence in question included evidence of conduct outside the sphere of the First Amendment. See 390 U.S. at 29–30 fn. 88 S. Ct. at 824–825 (Stewart, J., concurring); *id.* at 33 n. 2, 88 S.Ct. at 827 (Douglas, J., dissenting). Not only was there such "unprotected" evidence; it was evidently central to the prosecution's case in terms of emphasis and potential impact on the jury. It included, for example, evidence of Epton's guidance to an assemblage on "suckering" policemen onto side streets to kill them; his instructions on manufacture and use of weapons for street warfare; his planning of demonstrations and other events, not to convey ideas, but as occasions and techniques for the fomenting of physical violence. These were the kinds of things—evidence of efforts to promote "guerilla warfare," "terrorism," "killing"—that were relied upon in page after page of the prosecution's summation, the whole thrust of which was to dispel the claim that Epton had been engaged in peaceful persuasion and to show instead that "the important evidence" (Tr. 1803) demonstrated Epton's purpose directly and immediately to get people in Harlem to "start rioting, continue to riot, and * * * kept the situation fired up." (Tr. 1813). These are the realistically major and critical materials on which the New York Court of Appeals, unanimous in this respect, found the evidence, including words, to establish a " 'clear and present danger' of riot." 19 N.Y.2d 496 at 507, 281 N.Y.S. 2d 9 at 18, 227 N.E.2d 829 at 838.[9] And it seems evident from the character of

---

9. In his brief to the New York Court of Appeals (p. 69), petitioner insisted that the question of "clear and present danger" is one "for the court alone," and that the trial judge had erred in giving it to the jury.

the evidence and the arguments about it that the jury would not have convicted unless it had rejected petitioner's testimony that his violent language was figurative and had accepted the prosecutor's thesis that the talk of terror, killing and warfare was "advocacy of the use of force or of law violation * * * directed to inciting or producing imminent lawless action and * * * likely to incite or produce such action." Brandenburg v. Ohio, 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1968).

In this setting, building upon the dissent of Mr. Justice Douglas, 390 U.S. at 34 n.2, 88 S.Ct. 824, petitioner argues that the conviction must be nullified because the trial judge did not caution the jury against convicting solely on "constitutionally protected" overt acts. This court notes, however, that:

(1) there is no claim that any such limiting instruction was ever requested;

(2) petitioner never claimed error in the failure to give such an instruction in his brief to the New York Court of Appeals, his petition for certiorari or his jurisdictional statement;

(3) the absence of a request or argument on direct appeal is perfectly understandable since it seems plain that the jury, as a matter of fact, would not have convicted unless it had focussed precisely on the steadily emphasized evidence of unprotected overt acts.

It is not possible, of course, to be mathematically certain that the jury did not convict solely upon one of the "protected" overt acts. But this is true in most conspiracy cases, where the list of overt acts commonly includes many things, innocent in themselves, comprised of speech—meetings, conversa-

tions, communications. It has not followed that limiting instructions of the type petitioner now claims as essential must be given routinely.

Beyond that, this court finds solid conviction in the record here that the point so tardily urged is an empty abstraction. The possibility against which an instruction is now demanded was not a real one in terms of the evidence, the argument and the instructions before the jury.

C. A number of other issues are tendered with respect to various rulings of the state trial court and conduct of the prosecutor. They have been studied. The court concludes that they do not, individually or collectively, constitute a basis for federal habeas corpus.

### III.

Petitioner has been on bail for almost three years while the State Courts considered the grand jury problem left for them on grounds of comity. There has never been any question that the problem was one of substance. Nevertheless, but for our bail order, Epton would have served his sentence long before the State had completed its proceedings. Cf. Green v. City of Orlando, 313 F.Supp. 583, 584 (M.D.Fla.1970). Despite this court's conclusions today, there remains an authoritative pronouncement that his claims have substance. See Chestnut v. People of State of New York, *supra*, 370 F.2d 1 at 6–7. The reasons underlying this court's order releasing petitioner on bail seem effective still for the period necessary for him to prosecute an expeditious appeal. Accordingly, that order remains effective, and this court, to minimize delay, now issues its certificate of probable cause under F.R.A.P. 22(b).[10]

---

10. The continuance of bail herein would not be ordered, of course, if it were thought inconsistent with Judge Anderson's order of July 31, 1970, sustained by a three-judge bench on September 18, 1970 (United States ex rel. Chestnut v. Criminal Court, 429 F.2d 1406, 2d Cir.), stay-

ing the district court's order granting bail to Chestnut and his co-petitioners. There, the conviction being for contempt of the grand jury, not for a crime charged by the grand jury, Judge Anderson stressed that "petitioners [were] not accused, indicted by an unconstitutionally

To conclude, then, for the reasons reviewed above, the petition is denied.

It is so ordered.

selected grand jury but [were] witnesses called to testify before a grand jury instituted, by the regular procedures of the State of New York, who were granted immunity and later held in contempt by the court for nonetheless refusing to testify. That there may have been some invalidity, even of constitutional dimensions in convening the jury is, in a case of this kind, completely irrelevant. Their affront was to the judicial system of the State and must be dealt with as is perjury in a prosecution based upon an unconstitutional criminal statute. See United States v. Manfredonia, 414 F.2d 760, 765, note 5 (2d Cir. 1969)." Memo. of Judge Anderson, Aug. 3, 1970, quoted in the *Chestnut* brief in this court.