[631 NYS2d 632]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
KENNY TOLIA, Also Known as KENNETH TOLIA, Appellant.

First Department, September 14, 1995

## APPEARANCES OF COUNSEL

*William A. Loeb* of counsel, New York City *(Philip L. Weinstein,* attorney), for appellant.

*Kathleen E. Fay* of counsel, New York City *(Norman Barclay* on the brief; *Robert M. Morgenthau, District Attorney* of New York County, attorney), for respondent.

## OPINION OF THE COURT

TOM, J.

Defendant appeals from a judgment convicting him of inciting to riot during a concert being held in Tompkins Square Park (the Park), located in the lower east side of Manhattan, which turned into a violent and tumultuous confrontation between the crowd and police.

Testimony educed at trial reveals that on April 28, 1990, a four-day concert began in the Park, which extends from 7th Street to 10th Street between Avenues A and B. A band shell is located on the 7th Street side of the Park facing north, in front of which is a concrete area 50 to 70 feet wide containing semicircular benches. The event was entitled the "Resist to Exist Concert" and a "Squatters May Day". Lori Sbordone and Mary Shero were two of the people who organized the festivities and obtained the necessary permits.

On Tuesday, May 1, 1990, the last scheduled day of the concert, the New York City Parks Department's and the New York City Police Department's permits specified that the use of amplifiers was to end at 7:00 P.M., but the organizers had subsequently obtained an extension to 9:00 P.M. The New York City police officer who was in charge at the scene was Inspector Michael Julian, commander of the Ninth Precinct. Also present in the Park was Sergeant Steven Marron and five other officers, all of whom were in uniform. The officers, who arrived at approximately 3:00 P.M., were familiar with the Park and its environs from frequently patrolling the area. Parks Department Enforcement Officers Michael Jordan and

Deedan King were also in the Park to monitor the event, and were in green khaki uniforms and unarmed.

During the course of the day, the crowd varied from between 50 to 100 people, who were generally well behaved, drinking and enjoying the music. Various bands took the stage during the day and individuals periodically took the microphone between songs and made statements such as "f__k the Police", "resist to exist" and "no housing, no peace." By 6:00 P.M., the crowd had swelled to approximately 200 people and defendant, Sbordone and others were making brief statements, saying "this is the resist to exist concert, Squat or Rot." Other statements attributed to defendant were that the Park is "our Park" and that the day was "squatters day."

Sbordone and another activist the police knew from the area, John Potak, led a group of marchers out of the Park between 6:00 P.M. and 6:30 P.M. and through the streets of Greenwich Village with Sergeant Marron and other officers following. The group carried banners which read "May Day", "Squat or Rot" and "F__k the Police." The marchers returned to the Park between 7:00 P.M. and 7:30 P.M.

In the interim, at approximately 6:30 P.M., Shero asked Inspector Julian to extend the concert's permit until 10:00 P.M., which Inspector Julian explained he had no authority to do. At approximately 7:30 P.M., and after the marchers had returned, defendant Kenny Tolia stepped up to the microphone and announced to the crowd "Be prepared to break the law tonight", "Be prepared to resist tonight" and "Be prepared to fight tonight." Although there was no immediate reaction forthcoming from the crowd, defendant's remarks sufficiently alarmed Inspector Julian to promptly call for additional officers, although he directed that some of them remain outside the Park.

At approximately 8:30 P.M., 7 to 10 additional plainclothes and anticrime officers arrived, including Captain Sullivan, Sergeants Bourken and Rittenhouse and other officers. At 8:45 P.M., the officers, following Inspector Julian's instructions, deployed themselves along the fringe of the crowd. At this time, crowd estimates ranged between 200 and 300 people present in front of the band shell and between 30 and 60 people on stage.

During this period, the music continued, occasionally interrupted by short speeches, including one by defendant who asserted: "This is the people's Park"; "Resist, the police are

coming. Resist"; and "Resist, resist, they're coming." Between 8:45 P.M. and 9:00 P.M., defendant is again alleged to have taken the microphone and announced either "The police are here to shut the power off at 9:00, we can't let them do that" or "The police are here to shut the power down and we have to resist the police."

At 9:00 P.M., the band on stage at the time, Spy vs. Spy, began a new song and Parks Department Officers Jordan and King together with Inspector Julian, Sergeant Marron and Officers Hernandez and Flynn proceeded toward the bandstand, allegedly not intending to stop the concert but to inquire as to how much longer the music would last. As the officers approached, Sbordone grabbed a microphone and announced "Here they come, here comes the park pigs, here comes the police."

As the officers reached the stairs leading to the stage, defendant purportedly went to a microphone near the center of the stage, pointed at the officers and yelled "The pigs are here to shut off the power and if you want the party to continue, you better let them know it" and "They are going to try to shut us down. What are we going to do? We are going to resist." Defendant then shouted "Resist" and began chanting "Whose f____g Park? Our f____g Park." Officer Flynn testified that he thought defendant also said "we are going to riot" or "something about riot", but was unsure. Defendant subsequently raised his arms over his head, waving the crowd toward the stage and encouraging people to come forward.

At approximately the same time, Parks Department Officers Jordan and King attempted to get up the steps leading to the stage, but were blocked by people massing at the top of the stairs who were using body blocks to stop them. Sergeant Marron eventually was able to get on the stage and inform Sbordone that the electricity would be turned off after the band finished the song it was then performing. Sergeant Marron then gave defendant the same news at which time defendant waved to the crowd and about 100 people surged forward from the audience while defendant and others already on the stage rushed toward the officers, grabbing, pushing and swinging at them. The officers were engulfed by the crowd. Defendant, Sbordone, Shero and about eight others then crossed their arms in front of them and began to push the Parks Department officers and Sergeant Marron from the stage.

As people continued to rush toward the stage, at least one bottle shattered against the bandstand wall above the officers' heads. At that point, Inspector Julian, believing that the crowd was reacting and throwing bottles in response to defendant's exhortations, ordered defendant's arrest. Inspector Julian and Sergeant Marron then attempted to grab defendant at which time numerous bottles began crashing around the officers while defendant began to fight with Marron and Julian. Additional officers came to Julian's aid as bottles began to hit the officers on and around the stage. Eventually, Officer Flynn was able to get one handcuff on defendant and he and Officer Hernandez struggled to get the second one on, but defendant kept his hand tucked under his body.

During this struggle, Sbordone jumped onto Sergeant Marron's back and began to choke him, but was quickly pulled off by Officer Quinn, who handcuffed Sbordone while bottles continued to rain all around them. Officer Hernandez then attempted to arrest Shero, who punched Hernandez in the face several times. While Officer Hernandez continued to wrestle with Shero, Officer Flynn was about one foot away with his knee on defendant's back, still trying to handcuff him. Marcus Skelloitt, standing on the concrete area directly in front of the stage, picked up an empty Jack Daniels bottle and threw it at Officer Flynn, hitting him in the back of the head rendering him unconscious. A number of other officers including Hernandez, Smeding, Kelly, Scottie and Julian[1] were injured by bottles thrown from the crowd and in struggles with various members of the concertgoers.

At approximately 9:15 P.M., 10 to 20 additional officers arrived at the Park but were ordered to regroup at a temporary headquarters on 10th Street and Avenue A by Inspector Julian, in the hope that the officers' departure would work toward calming the crowd. As the officers left, they secured the prisoners and placed the injured in ambulances. Two

---

1. Among the more seriously injured, Officer Flynn was hospitalized for four days and suffered chronic and severe headaches, vertigo, seizures, nausea and blackouts which were somewhat controlled by medication and which continued to the time of trial. Officer Flynn was eventually transferred to the 107th Precinct where he only answers telephones and can no longer carry a gun as he is unable to qualify at the firing range. Officer Hernandez suffered a concussion and bloody nose and did not return to full duty for four weeks. Officer Smeding received a concussion and lacerations after being hit in the head by a bottle. Officer Kelly received 11 stitches for a head wound and suffered from chronic headaches and loss of mobility in his neck up until the time of trial.

officer teams were posted along Avenue A from 6th Street to 9th Street in order to monitor the crowd in the event it left the Park.

At 9:45 P.M., 40 to 50 officers were assembled at the mobile headquarters and the crowd remaining in the Park again became boisterous, throwing bottles and lighting a bonfire in front of the bandstand. At 10:30 P.M., approximately 150 people marched to St. Marks Place and Avenue A where they blocked the street, walked over cars, overturned garbage cans and set a second fire in the middle of the street. More officers arrived and before the crowd finally dissipated, other officers and participants were injured and more arrests were made.

At trial, the People introduced a videotape of the events which occurred in the Park, although the tape contains breaks and did not depict all of the events preceding defendant's arrest. The videotape shows Inspector Julian attempting to get a hold on defendant, defendant's struggle with Julian and Sergeant Marron and Officer Flynn's attempt to place defendant in handcuffs. Bottles can be seen breaking all around the stage with pieces of glass hitting officers and civilians. The tape also shows Parks Department Officer King being hit in the face with a bottle or rock and Captain Sullivan being hit with something thrown from in front of the stage.

The defense also introduced a videotape which, like the People's exhibit, contained several breaks and did not depict all of the events leading to defendant's arrest. The tape does show: Sergeant Marron walking toward the band shell and subsequently speaking to Sbordone and then defendant; defendant walking toward the corner of the stage after getting off the microphone; Sergeant Marron trying to regain his balance at the top of the stairs after being shoved by the crowd; and Inspector Julian and Sergeant Marron struggling to arrest defendant.

By indictment No. 9502/90, filed on August 10, 1990, a New York County Grand Jury charged defendant with riot in the first degree (Penal Law § 240.06) and inciting to riot (Penal Law § 240.08).[2] Defendant was convicted on February 5, 1992, after a jury trial, of inciting to riot and was acquitted of riot in the first degree. Defendant was sentenced to one year in prison.

---

2. A number of other participants in the incident in question were charged under the same indictment for the crimes of riot, inciting to riot, assault in the second degree (Penal Law § 120.05 [2], [3]) and criminal possession of a weapon in the third degree (Penal Law § 265.02 [1]).

■ Defendant now appeals his conviction on the grounds, *inter alia,* that the evidence presented was legally insufficient and that his conviction was against the weight of the evidence. We disagree.

Penal Law § 240.08 states: "A person is guilty of inciting to riot when he urges ten or more persons to engage in tumultuous and violent conduct of a kind likely to create public alarm."

Viewing the evidence in a light most favorable to the People *(People v Malizia,* 62 NY2d 755, *cert denied* 469 US 932; *People v Jemmott,* 202 AD2d 366, *lv denied* 83 NY2d 911), we find that the evidence presented at trial was more than sufficient to establish defendant's guilt. After Inspector Julian declined to extend the permit beyond the 9:00 P.M. cutoff, defendant addressed the crowd via microphone and stated "Be prepared to break the law tonight", "Be prepared to resist tonight" and "Be prepared to fight tonight." These statements sufficiently alarmed Inspector Julian, the ranking New York City police officer on the scene, to call for reinforcements.

Approximately one hour later, as four uniformed officers approached the stage, defendant again took the microphone, pointed at the officers and began yelling to the crowd, warning that "The pigs are here to shut off the power and if you want the party to continue, you better let them know it." Defendant also allegedly added "They are going to try to shut us down. What are we going to do? We are going to resist." Officer Flynn also testified that defendant may have said something about "riot", but was unsure. Moments before bottles started flying and the crowd surged up behind the officers, the defendant, in addition to his remarks, was continuously waving the crowd forward to use force and resist before leaving the microphone at the center of the stage and attempting to push the officers off the stairs.

Defendant also argues that although the statute includes no mens rea element, the First Amendment requires proof that he intended to incite violence, and that his conviction thereby violates the First and Fourteenth Amendments to the United States Constitution and article I of the New York State Constitution.

Although Penal Law § 240.08 does not specifically set forth the element of intent to create violence, the constitutionality of the statute requires both elements of "intent" and "clear and present danger" before one's freedom of speech may be

abridged under the First Amendment *(see, Brandenburg v Ohio,* 395 US 444, 447-448; *People v Winston,* 64 Misc 2d 150, 156).

It is a long-standing principle of constitutional jurisprudence that requires the exacting scrutiny of prohibitions against the freedom of speech. It must also be recognized, however, that a strong presumption of constitutionality attaches to State statutes and that wherever possible, the courts must construe a statute in a manner which avoids constitutional defects *(People v Liberta,* 64 NY2d 152, 171, *cert denied* 471 US 1020; *People v Epton,* 19 NY2d 496, 505, *mot to amend remittitur granted* 19 NY2d 1017, *cert denied* 390 US 29; *People ex rel. Simpson v Wells,* 181 NY 252, 257), and that "the societal value of speech must, on occasion, be subordinated to other values and considerations" *(Dennis v United States,* 341 US 494, 503).

In *Brandenburg v Ohio (supra),* the United States Supreme Court, reiterating its holding in *Noto v United States* (367 US 290, 297-298), held that " '[T]he mere abstract teaching * * * of the moral propriety or even moral necessity for a resort to force and violence, is not the same as preparing a group for violent action and steeling it to such action' " *(Brandenburg v Ohio, supra,* at 448; *see also, Herndon v Lowry,* 301 US 242, 259-261). The Court continued that "Statutes affecting the right of assembly, like those touching on freedom of speech, must observe the established distinctions between mere advocacy and incitement to imminent lawless action" *(Brandenburg v Ohio, supra,* at 449, n 4).

In setting forth the "clear and present danger" standard, Justice Oliver Wendell Holmes, in writing for a unanimous Court, held that: "The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent. It is a question of proximity and degree." *(Schenck v United States,* 249 US 47, 52; *Lewis v American Fedn. of Tel. & Radio Artists,* 34 NY2d 265, 272, *cert denied* 419 US 1093.)

In the matter before us, there can be no doubt that defendant's intentional actions posed a "clear and present danger" which led to violent, tumultuous behavior engaged in by 10 or more people. Indeed, this is not a case of a few poorly chosen

words which led to unintended consequences, as the defendant herein argues. Rather, it is a case of steadily deteriorating circumstances worsened by defendant's relentless calls for the crowd to use force to resist and stop the police from ending the concert, at which police officers were greatly outnumbered. Defendant, from the testimony presented, could not have failed to recognize the mood of the crowd, as at least one bottle had already been thrown and the people on the stage had began grabbing, pushing and swinging at the police officers before defendant once again took the microphone and waved the highly agitated crowd forward to which the crowd responded by surging towards the police officers. The riot began seconds later. It is clear, therefore, that under the facts presented herein, defendant's speech is not of the variety protected by the United States and New York Constitutions but was calculated to incite and produce imminent lawless action *(compare, Hess v Indiana,* 414 US 105, 109; *Brandenburg v Ohio, supra,* at 447; *Texas v Johnson,* 491 US 397, 409).

■ Lastly, defendant maintains that the jury charge was improper due to the court's use of the words "provoked" or "stimulated" as a synonym for the word "urge", which improperly allowed the jury to find defendant guilty on a theory of pure causation.

Initially, we note that defendant's argument is unpreserved for our review as a matter of law and we decline to review it in the interests of justice *(People v Dingle,* 168 AD2d 281, *lv denied* 77 NY2d 960). Were we to review the merits of defendant's claim, we would find that the court's definition of the word "urge" properly conveyed its correct meaning to the jury; that to find defendant guilty of the crime charged, the People had to prove his intent to create violence; and that there was a clear and present danger his actions would do so.

Accordingly, the judgment of the Supreme Court, New York County (Richard C. Failla, J.), rendered on April 6, 1992, which convicted defendant, after a jury trial, of inciting to riot and sentenced him to a one-year prison term, unanimously affirmed.

SULLIVAN, J. P., ELLERIN, RUBIN and WILLIAMS, JJ., concur.

Judgment, Supreme Court, New York County, rendered April 6, 1992, affirmed.