OPINION OF THE COURT
Alexander W. Hunter, Jr., J.
The ex parte application by MP (petitioner) for a writ of habeas corpus directing the respondent, Charles Ramesar, M.D., Deputy Director of Bellevue Hospital Center, Department of Psychiatry, to release him from the hospital is granted.
Petitioner is a 26-year-old male with a documented history of violence and incarceration but no formal psychiatric history who, at the time of the hearing, was residing at the Jack Ryan Residence homeless shelter (shelter).
On September 25, 2015, the petitioner was brought into Bellevue Hospital’s Comprehensive Psychiatric Emergency Program (CPEP) following a verbal altercation with shelter police. During his evaluation, it was noted that the petitioner was not intoxicated, had no signs of mania/psychosis/depression and was exhibiting good behavior. As a result, the petitioner was treated and released back to the shelter. The next day, the petitioner was returned to the CPEP by an on-site shelter doctor because of his status as a “hub client,”[1] and not due to any acute symptoms of a mental illness. For the next four days, the petitioner was placed on “hold status” for further evaluation and although he continued to exhibit good behavior and showed no acute symptoms of mental illness, his request to be discharged from the CPEP was denied. Petitioner was diagnosed with antisocial personality disorder (ASPD) for which inpatient hospitalization is rarely, if ever, appropriate and medication has proven to be ineffective. Notwithstanding this *678 diagnosis and the fact that the petitioner’s treating psychiatrists found no evidence of an underlying mental illness that would benefit from inpatient hospitalization, he was transferred to the inpatient unit at Bellevue Hospital pursuant to Mental Hygiene Law § 9.39 in conjunction with New York City Mayor Bill de Blasio’s “NYC Safe” initiative.[2] (Tr at 19, lines 14-16.)
On October 1, 2015, the petitioner requested a hearing pursuant to section 33.15 of the Mental Hygiene Law for a writ of habeas corpus to determine the cause and legality of his detention. A hearing was held on October 2, 2015.
At the hearing, the hospital called Dr. Deepali Gangahar, a psychiatrist at Bellevue Hospital, in an attempt to meet its burden pursuant to Mental Hygiene Law § 9.39. Upon examination, Dr. Gangahar testified that the petitioner was initially admitted due to an altercation with shelter police, then was subsequently discharged and readmitted because of his status as a hub client. (Tr at 13, lines 1-3.) She further indicated that although a decision to discharge a patient is normally made by the treatment team, in the petitioner’s case, discharge must be coordinated with a liaison from the Mayor’s Office. (Tr at 10, lines 8-15.) At the time of the hearing, Dr. Gangahar was unable to state with a reasonable degree of psychiatric certainty that the petitioner suffered from any form of psychosis and stated he was being committed to the hospital because of his dangerousness. (Tr at 7, lines 20-23; at 8, lines 11-12; at 27, line 3.)
An emergency involuntary admission pursuant to section 9.39 (a) of the Mental Hygiene Law requires that the patient be a “person alleged to have a mental illness for which immediate observation, care, and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or others.” In accordance with Mental Hygiene Law § 9.39 (a), “[l]ikelihood to result in serious harm” is defined as: (1) a substantial risk of physical harm to himself as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that he is dangerous to himself; *679 or (2) a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm. Thus,
“[i]n order to retain a patient in a hospital for involuntary psychiatric care, the hospital must establish by clear and convincing evidence that the patient is mentally ill and in need of further care and treatment, and that the patient poses a substantial threat of physical harm to himself or to others.” (Matter of John P., 265 AD2d 559, 559 [2d Dept 1999] [emphasis added]; see also Matter of Seltzer v Grace J., 213 AD2d 412 [2d Dept 1995]; Matter of William G., 196 Misc 2d 51, 54 [Sup Ct, Oneida County 2003].)
Described as an “unprecedented partnership between law enforcement and health care agencies that will completely change how the City intervenes to stop and respond to violence by the seriously mentally ill,” the NYC Safe initiative was created by the de Blasio Ad ministration to provide untreated mentally ill individuals with support by connecting them with consistent care to avoid crises and violence. This new initiative includes a series of interventions designed to meet the specialized needs of this population. Specifically, the plan calls for:
• The creation of a number of new clinical care options designed to fill gaps in the City’s existing continuum of mental health care.
• The creation of the new NYC Safe hub, designed to share appropriate information about high concern individuals to more effectively connect them with enhanced services.
• Targeted investments to improve safety in and around homeless shelters.[3]
Pursuant to Mental Hygiene Law § 33.15 (a), “[a] person retained by a facility ... is entitled to a writ of habeas corpus to question the cause and legality of detention upon proper application.” In determining the legality of the detention, the court must “examine the facts concerning the person’s alleged *680 mental disability and detention,” and may discharge the patient only “if it finds that he [or she] is not mentally disabled or . . .in need of further retention for in-patient care and treatment.” (People ex rel. DeLia v Munsey, 26 NY3d 124, 127 [2015]; Mental Hygiene Law § 33.15 [b].)
Upon review of the facts concerning the petitioner’s alleged mental disability and detention, this court finds that the petitioner’s detention pursuant to Mental Hygiene Law § 9.39 in conjunction with the NYC Safe initiative was unlawful and in violation of the petitioner’s due process rights.
As an initial matter, this court finds that the hospital failed to meet its burden in establishing by clear and convincing evidence that the petitioner: (1) suffers from a mental illness; and (2) is in need of further treatment. Petitioner was diagnosed with ASPD for which immediate observation, care, and treatment in a hospital is inappropriate since the disorder is neither responsive to nor treatable with medications. The hospital improperly relied on the petitioner’s alleged dangerousness to meet its burden which, alone, is insufficient to warrant the emergency involuntary admission of a person pursuant to Mental Hygiene Law § 9.39.
It is well settled that confinement of an individual based on dangerousness alone violates due process. (See Foucha v Louisiana, 504 US 71, 112 [1992] [the Supreme Court held that the Louisiana statute allowing continued confinement of insanity acquittee on basis of his antisocial personality, after hospital review committee had reported no evidence of mental illness and recommended conditional discharge, violated due process]; see also Kansas v Hendricks, 521 US 346 [1997] [a finding of dangerousness, standing alone, is ordinarily not sufficient ground upon which to justify indefinite involuntary commitment].)
The petitioner was evaluated by three different psychiatrists, including Dr. Gangahar, all of whom found no clinical need for continued hospitalization and attempted to discharge him.[4] Typically, a psychiatrist’s recommendation is sufficient for discharge. However, in this unprecedented abrogation of patient care, the NYC Safe initiative now requires the hospital to coordinate care with a liaison from the Mayor’s Office of *681 Criminal Justice, who neither treated nor observed the patient, yet is charged with the task and medical responsibility of rendering an opinion as to the patient’s continued need for psychiatric treatment. (Tr at 26, lines 14-18.) In this case, Kristine Schuerger, the liaison from the Mayor’s Office, recommended that the petitioner remain in the hospital, and as a result, the hospital admitted the petitioner under Mental Hygiene Law § 9.39 notwithstanding the fact that he did not meet the standard for confinement and treatment. (TV at 10, lines 4-15.)
“An involuntary civil commitment is a massive curtailment of liberty, and it therefore cannot permissibly be accomplished without due process of law.” (Olivier v Robert L. Yeager Mental Health Ctr., 398 F3d 183, 188 [2d Cir 2005] [internal quotation marks omitted].) “The loss of liberty produced by an involuntary commitment is more than a loss of freedom from confinement. Due process requires that the nature of commitment bear some reasonable relation to the purpose for which the individual is committed.” (Foucha, 504 US at 79 [internal quotation marks and citations omitted].) It is clear from the record that the petitioner was involuntarily committed under Mental Hygiene Law § 9.39 simply because of his status as a hub client.[5] Then, in what may only be characterized as a disingenuous attempt by the hospital to meet the standard, Dr. Gangahar, despite her familiarity with the standard for commitment under Mental Hygiene Law § 9.39, mischaracterized the petitioner’s mental status to comport with the requirements of the statute.[6]
*682 “In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception.” (United States v Salerno, 481 US 739, 755 [1987].) While placement in the NYC Safe hub is designed to allow health care agencies to share appropriate information about “high concern individuals” in an effort to connect them with services, in practice, it subjected the petitioner and probably other individuals to involuntary confinement for an indefinite amount of time without first establishing that the individual is mentally ill and dangerous. The NYC Safe hub is not a valid legal standard for involuntarily committing a person under Mental Hygiene Law § 9.39. Although this court is sensitive to the Mayor’s desire to make the City safe by reducing the number of people on the streets that have behavioral issues, the de Blasio Administration cannot use the Mental Hygiene Law in this way to deprive this historically marginalized population of their due process rights.
Accordingly, it is hereby adjudged that the ex parte application by MP for a writ of habeas corpus directing Charles Ramesar, M.D., Deputy Director of Bellevue Hospital Center, Department of Psychiatry, to release him from the hospital is granted.[7]

. “The NYC Safe hub” (hub) is a tracking system developed to follow individuals with a history of violent behavior in an effort to effectively identify these individuals and connect them to treatment. (See NYC Safe Fact Sheet, http://wwwl.nyc.gov/assets/home/downloads/pdf/press-releases/ 2015/NYCSafeFactSheet.pdf [accessed Jan. 21, 2016], cached at http:// www.nycourts.gov/reporter/webdocs/NYCSafeFactSheet_final.pdf.)

. The “NYC Safe” initiative is “an evidence-driven program to support the narrow population of New Yorkers with untreated serious mental illness who pose a concern for violent behavior.” (See Mayor de Blasio Announces “NYC Safe,” An Evidence-Driven Public Safety And Public Health Program That Will Help Prevent Violence, http://wwwl.nyc.gov/office-of-the-mayor/ news/540-15/mayor-de-blasio-nyc-safe-evidence-driven-public-safety-publichealth-program [accessed Feb. 1, 2016], cached at http://www.nycourts.gov/ reporter/webdocs/Mayor-de-Blasio-Announees-NYC-Safe.pdf.)

. See NYC Safe Fact Sheet, http://wwwl.nyc.gov/assets/home/downloads/ pdf/press-releases/2015/NYCSafeFactSheet.pdf (accessed Jan. 21, 2016), cached at http://www.nycourts.gov/reporter/webdocs/NYCSafeFactSheet_ final.pdf.

. At the hearing, Dr. Gangahar was asked by the petitioner’s attorney: “You wanted to discharge, Dr. Nau wanted discharge, and Dr. Dark was considering discharge?” Dr. Gangahar replied, ‘Yes.” (Tr at 26, lines 11-13.)

. A review of the record revealed that: (1) Lee Hogan, the shelter supervisor, stated that the petitioner had “been in good behavioral control since his release but was returned to Bellevue because he is a hub client and so he is not supposed to be released from the hospital”; and (2) Dr. Kedzior, the shelter physician, reiterated that the petitioner “was returned to the hospital because of his status as a hub client and not due to any acute symptoms of mental illness.” (See exhibit A at 4.)

. To meet the standard for commitment, Dr. Gangahar testified that although “she thinks he is psychotic and dangerous,” it was “difficult for [her] to make an evaluation,” and that the petitioner was being committed to the hospital because of his “dangerousness.” (Tr at 7, lines 20-23; at 8, lines 11-12; at 27, line 3.) To prove dangerousness, Dr. Gangahar testified that she thought the petitioner “could potentially harm someone, and that [this belief] is supported by his history of assault on multiple people particularly in the shelter system.” (Tr at 8, lines 23-26.) She further testified that during his hospitalization, the petitioner required two crisis management interventions (CMT). However, upon further examination of the record, it is clear that for the majority of the petitioner’s hospitalization he remained calm and coopera *682 tive and the CMTs were due to his frustration arising from this involuntary commitment. When Dr. Gangahar was asked by the petitioner’s attorney whether “the CMTs [summoned for the petitioner] had been in the context of [him] being frustrated, demanding discharge and not being clear as to why he was still in the hospital,” Dr. Gangahar replied, “the first one was about that, the second one was an interaction with another patient about the phone.” (Tr at 15, lines 3-16; at 18, lines 14-21.) Moreover, it was noted in the medical record that the petitioner
“became angry that he was not given a discharge date from the treatment team due to the Mayor’s initiative, and threatened violence requiring CMT intervention and medication. Patient is chronic risk of harm to others given his history of substance abuse and history of violence however there [are] no acute psychiatric needs of this patient that will be responsive to medication intervention while hospitalized on inpatient psychiatry.” (See exhibit A at 26.)
Thus, it was only after the petitioner was involuntarily committed for three days, demanded discharge and was told that his discharge must be coordinated with the Mayor’s Office, that he required crisis intervention. (Id.)

. It is noted that the application was granted on October 2, 2015, and this court ordered the petitioner’s immediate release.